UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARCH SPECIALTY INSURANCE
COMPANY,

       Plaintiff,

v.

CORRECTIONAL HEALTH
RESOURCES, INC.,

       Defendant.
                                    /

File No. 1:03-CV-526

HON. ROBERT HOLMES BELL

**O P I N I O N**

Plaintiff Arch Specialty Insurance Company ("Arch") moves for summary judgment on its contention that it has no duty to defend or indemnify Defendant Correctional Health Resources ("CHR") in connection with claims arising out of the deaths of two inmates at the Yuma County Arizona Detention Center that occurred prior to the inception of Arch's policy of insurance.

**I.**

The essential facts are not in dispute. CHR is a Michigan corporation that is in the business of providing medical staffing to correctional facilities. CHR contracted to provide health care services at the Yuma County Detention Center in Yuma County, Arizona, beginning in August 2001. In October 2001 two inmates at the Yuma County Detention Center died in separate incidents. On October 11, 2001, Kelly Mikkelsen died of a drug

overdose in his cell after he returned from his daily work furlough. (Mikkelsen Incident Report, Pl. Ex. H). On October 13, 2001, Baldomero Gonzalez-Salgado committed suicide by hanging himself by a pillowcase from the top of a cross-bar of the double bunked bed. (Gonzalez-Salgado Incident Report, Pl. Ex. J).

Kenneth L. Faiver is the president and a fifty percent owner of CHR. (Faiver Dep. at 28; Arch Ins. Application, Pl. Ex. F). Faiver was in Arizona on October 11, 2001, when Mikkelsen died. After learning of the incident, Faiver went to the Yuma County Detention Center and began an investigation into the circumstances of Mikkelsen's death. (Faiver Dep. at 47). On October 13, 2001, while Faiver was still in Yuma County investigating Mikkelsen's death, Gonzalez committed suicide. Faiver stayed in Arizona for two weeks and spent approximately 80 hours investigating the circumstances of the Mikkelsen and Gonzalez deaths. (Faiver Dep. at 65). Following an interdisciplinary mortality review of the deaths he concluded in his incident reports that Mikkelsen's death was accidental and that all of the nursing staff had acted appropriately, (Pl. Ex. H), and that all of the nursing staff had acted appropriately with respect to Gonzalez as well. (Pl. Ex. J; Faiver Dep. at 47-52, 54-55). Notwithstanding this conclusion, Faiver understood at the time of the investigations that CHR could be sued as a result of the Mikkelsen and Gonzalez deaths. (Faiver Dep. at 52, 55).

From 1997 through 2003 Richard M. Campau was CHR's associate director. (Campau Dep. at 9). He was in charge of recruiting healthcare professionals, preparing proposals for

providing health care services, and implementing the healthcare delivery services program. (Campau Dep. at 9-10). He was also involved in procuring insurance and in risk management issues. (Campau Dep. at 19, 24-25). When Faiver returned to Michigan, he and Campau "discussed that there was a death and that because our healthcare staff was involved that there could be a lawsuit" against CHR (Campau Dep. at 24-25).

In February 2002, Rubecca Mikkelsen filed an action against Yuma County for the wrongful death of Kelly Mikkelsen. In April 2002, Taylor Fox also filed an action against Yuma County for the wrongful death of Kelly Mikkelsen. These two actions were consolidated and removed to the United States District Court for the District of Arizona. *Mikkelsen v. Correctional Health Resources, Inc.*, Case No. CIV 02-2252-PHX-JAT (D. Ariz.). CHR was not a party to the *Mikkelsen* action as originally filed.

At the time of the two inmate deaths at theYuma County Detention Center in October 2001, CHR had liability insurance through Lexington Insurance Company. The Lexington policy extended from October 1, 2001 to October 1, 2002. In the summer of 2002, CHR completed a renewal application for the Lexington policies in which it disclosed the deaths of Mikkelsen and Gonzalez. (Faiver Aff. ¶ 4, Def. Ex. E). CHR also requested Willis of Tennessee, Inc., an insurance broker, to obtain insurance estimates from other insurers. In August 2002, Arch received a copy of CHR's 2002-2003 renewal application with Lexington and the opportunity to bid on the insurance contract. The Lexington application asked whether CHR was "aware of any circumstance, accident or loss which has occurred after the

3

retroactive date, which may result in a claim?" CHR responded "see attached." Arch contends that it requested, but was never provided the attachments. (Apel Aff. ¶¶ 2-3). CHR contends that it provided these documents to Willis. (Faiver Aff. ¶ 4).

Arch issued a binder for the insurance coverage effective October 1, 2002. (Binder, Def. Ex. D). On October 7, 2002, the *Mikkelsen* complaint was amended to add CHR as a defendant. The amended complaint was served on CHR on October 15, 2002. The amended complaint alleged, inter alia, that CHR had notice that Mikkelsen was in need of immediate medical care and attention and did not provide the medical services he required. (Amended Compl., Pl. Ex. I).

On November 1, 2002, after Arch had already bound the policy with CHR, CHR filed its application for insurance with Arch. Under the Policy and Loss Information portion of the application CHR responded affirmatively to the question "Are you aware of any accident, circumstance or loss which has occurred that might give rise to a claim or suit in the future." (Pl. Ex. F at p.8).

On February 11, 2003, Arch issued CHR the written Healthcare Professional Liability Policy bearing number 52FLP0552500, covering the period of October 1, 2002 to October 1, 2003. The Arch policy provides claims-made coverage and has limits of liability of $1,000,000 each event/$3,000,000 aggregate, with a $25,000 deductible. Section I of the Arch Policy explains the coverage and states that "coverage does not apply to any 'claim' or

'suit' that any insured knew about or could have reasonably foreseen or discovered before the 'original inception date' of this coverage."[1]  (Pl. Ex. B at Arch 404).

In a letter dated October 31, 2002, Arch agreed to defend the *Mikkelsen* action under a reservation of rights along with Lexington, the prior insurer.  (Pl. Ex. N & F).  No action has been commenced in connection with the death of Gonzalez.

---

[1]The coverage section of the policy states in pertinent part:

**1. Insuring Agreement**

a.  We will pay amounts that the insured becomes legally required to pay as damages because of "medical professional injury" that results from acts or omissions in the providing of or failure to provide "health care professional services" by or for an insured.

b.  This coverage applies to "medical professional injury" only if:

(1) The injury is caused by a "medical incident" that takes place in the "coverage territory";

(2) The "medical incident" did not occur before the "retroactive date" shown in the Declarations or after the end of the policy period; and

(3) A "claim" or "suit", with respect to the "medical professional injury", is first made against any insured and reported to us in writing, in accordance with Paragraph d. below, during the policy period or an extended reporting period we provide in accordance with Section V – Extended Reporting Period.

But this **coverage does not apply to any "claim" or "suit" that any insured knew about or could have reasonably foreseen or discovered** before the "original inception date" of this coverage.

Arch Policy, Section I(1) (emphasis added).

5

Arch seeks a declaration that it has no duty to indemnify or defend CHR for any claim or suit arising from the death of Mikkelsen or the death of Gonzalez because CHR knew that the deaths would likely result in demands for damages against CHR prior to the original inception date of the Arch policy and that these claims accordingly do not fall within the scope of coverage of the Arch policy. CHR contends there are issues of fact that preclude summary judgment.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendants carry their burden of showing there is an absence of evidence to support a claim then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

"On summary judgment, all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the parties opposing the motion." *Hanover Ins. Co. v. American Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994) (citing *Matsushita*, 475 U.S. at 586-88). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's

position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id. See generally, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

In response to Arch's motion for summary judgment CHR requested that this action be stayed pending resolution of a similar action in Arizona. This request is now moot because the Arizona declaratory judgment action against Arch has been dismissed without prejudice. (Docket # 41).

### III.

Jurisdiction in this declaratory judgment case is based upon diversity of citizenship. The Arch policy that the Court is required to construe was issued by a Wisconsin corporation with its principal place of business in New York to a Michigan corporation. The underlying loss occurred in Arizona. This Court's first consideration is what law governs this Court's interpretation of the policy.

When sitting in diversity, a federal district court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Mahne v. Ford Motor Co.*, 900 F.2d 83, 85 (6th Cir. 1990). CHR does not dispute Arch's assertion that Michigan would apply its own law to interpret insurance policies issued to Michigan companies, even if the underlying loss occurs outside of the state. The Court agrees. *See, e.g.*, *LoDal, Inc. v. Home Ins. Co.*, Case No. 95-2187, 1998 U.S. App. LEXIS 12841 (6th Cir.

June 12, 1998) (applying Michigan law to insurance dispute where insured was a Michigan corporation, insurer was an Illinois corporation, and injury occurred in California); *Underwriters at Interest v. SCI Steelcon*, 905 F. Supp. 441, 444 (W.D. Mich. 1995) (Bell, J.) (applying Michigan law to interpret insurance policies issued to Michigan companies, even though last act of contracting occurred in Texas).

Arch contends it is entitled to a declaration that it has no duty to defend or indemnify CHR for any claims arising from the Mikkelsen or Gonzalez deaths because these risks were not covered by the policy.

Under Michigan law an insurer does not have a duty to defend or indemnify the insured if the policy does not apply. *Protective Nat'l Ins Co. of Omaha v City of Woodhaven*, 438 Mich. 154, 159; 476 N.W.2d 374 (1991). The insurer's duty to defend is construed more broadly than the duty to indemnify: "unlike the duty to indemnify, Michigan's law requires a insurer to defend not only when the underlying claim is actually covered by the policy, but also when the underlying claim is "arguably" covered by the policy." *Cincinnati Ins. Co. v. Zen Design Group, Ltd.*, 329 F.3d 546, 552 (6th Cir. 2003) (quoting *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 443 N.W.2d 734, 737 (1989)). With regard to both the duty to indemnify and the duty to defend, the Court must first "look to the language of the insurance policy and construe its terms to find the scope of the coverage of the policy." *Radenbaugh v. Farm Bur. Gen. Ins. Co.*, 240 Mich. App. 134, 138, 610 N.W.2d 272, 275 (2000).

Under Michigan law "interpretation of insurance policies is governed by the same principles used to interpret ordinary contracts." *Cincinnati Ins.*, 329 F.3d at 553 (citing *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 460 Mich. 558, 596 N.W.2d 915, 920 (1999)). The court is required to look at the policy as a whole and to give meaning to all of its terms. *Id.* (citations omitted). "Unambiguous contract provisions are not subject to interpretation and must be enforced as written." *Id.* (citations omitted). Contract provisions are considered ambiguous when the "terms are reasonably and fairly susceptible to multiple understandings and meanings." *Id.* (quoting *Equitable Life Assurance Soc'y v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998)).

Insurance companies should not be liable for risks not assumed in the language of the policy. *Cincinnati Ins.*, 329 F.3d at 552-53 (6th Cir. 2003) (citing *Nikkel*, 596 N.W.2d at 920). However, the burden is on the insurer to show that a specific tendered claim is not covered under its policy. *Id.* at 553 (citing *Fresard v. Mich. Millers Mut. Ins. Co.*, 414 Mich. 686, 327 N.W.2d 286, 289 (1982)).

In the Coverage section of its policy Arch agrees generally to cover "medical professional injury," but specifies that "coverage does not apply to any 'claim' or 'suit' that any insured knew about or could have reasonably foreseen or discovered before the 'original inception date' of this coverage." Accordingly, the issue for this Court is whether the Mikkelsen and Gonzales incidents were "claims" that CHR "could have reasonably foreseen" before the inception date of coverage under the Arch policy.

9

CHR does not contend that the coverage limitation provision is ambiguous. Neither does CHR refute Arch's contention that the Mikkelsen and Gonzalez incidents were claims CHR could have reasonably foreseen. The undisputed testimony of CHR's officers is that CHR's officers were aware in October 2001 that CHR could be sued for the deaths of Mikkelsen and Gonzalez. (Faiver Dep. at 52, 55; Campau Dep. at 24-25, 40-41). In April 2002 CHR's officers knew that Mikkelsen had commenced a suit against the Yuma County Detention Center and they knew that the statute of limitations on the Mikkelsen and Gonzales claims against CHR would not run until October 2003. (Favier Dep. at 60-61; Campau Dep. at 27-29). Prior to coverage being bound with Arch, CHR was served with a subpoena for Mikkelsen's medical records and all policy and procedure manuals pertaining to the medical department of the Yuma County Detention Center in July 2002. (Subpoena, Pl. Ex. L). After being served with the subpoena Faiver and Campau again spoke about the possibility of CHR being sued. (Campau Dep. at 38-39). Faiver understood that the plaintiffs in the Mikkelsen suit were looking into healthcare issues at the Yuma County Detention Center, that CHR could be brought into that action, and he had conversations with the Yuma Detention Center personnel about the status of the Mikkelsen action. (Faiver Dep. at 60-61, 67-68).

Although CHR does not dispute that the Mikkelsen and Gonzalez incidents were claims that CHR could have reasonably foreseen, CHR nevertheless contends that the policy limitation does not apply because Arch had actual notice of circumstances that could give rise to a claim prior to its decision to bind the policy and its failure to exclude the Mikkelsen and

10

Gonzalez claims in the binder or in its October 31, 2002, correspondence amounted to a waiver of its right to exclude coverage of these incidents.

Although there is an issue of fact as to whether Arch had actual notice of the Mikkelsen and Gonzalez incidents, this factual issue is not material to the resolution of the issue of coverage. Even assuming that Arch did have actual notice, CHR has no authority to support its contention that Arch waived its ability to deny coverage for claims arising from these incidents by its failure to notify CHR of its intent to exclude them.

CHR cites two cases in support of its contention that an insurer has waived or is estopped from asserting defenses that it has not raised in an initial denial letter. *See In re Smith Estate*, 226 Mich. App. 285, 290, 574 N.W.2d 388, 390 (1997) ("Generally, once an insurance company has denied coverage to an insured and stated its defenses, the company has waived or is estopped from raising new defenses."); *Lee v. Evergreen Regency Co-op. & Management Systems, Inc.*, 151 Mich. App. 281, 285, 390 N.W.2d 183, 185 (1986) (same).

The cases CHR relies on do not support application of the waiver rule to the facts of this case. First, Arch did not deny coverage in its October 31, 2002, letter. Instead, Arch agreed to defend the Mikkelsen suit under a reservation of rights. Thus, the letter is not properly characterized as a denial letter, as required by *Smith* and *Lee* as a prerequisite to application of the waiver and estoppel doctrine.

11

Second, as noted in *Lee*, Michigan courts have long recognized that waiver and estoppel "are not available to broaden the coverage of a policy so as to protect the insured against risks not included therein or expressly excluded therefrom," because an insurer "should not be required by waiver and estoppel to pay a loss for which it charged no premium." 390 N.W.2d at 185 (quoting 1 A.L.R.3d 1139, 1144, and citing *Ruddock v. Detroit Life Ins. Co.*, 209 Mich. 638, 177 N.W. 242 (1920)).[2] "[W]aiver and estoppel are not available where their application would result in broadening the coverage of a policy, such that it would 'cover a loss it never covered by its terms . . . [and] create a liability contrary to the express provisions of the contract the parties did make.'" *Smit v. State Farm Mut. Auto. Ins. Co.*, 207 Mich. App. 674, 680, 525 N.W.2d 528, 531 (1994) (quoting *Ruddock*, 209 Mich. at 654). Thus, in *Lee*, the court held that although the insurer denied coverage without referencing its claims made or policy exclusion defense, it was not prohibited from raising these defenses in a later action. 390 N.W.2d at 186-87.

Arch's policy specifically provides that its "coverage does not apply to any 'claim' or 'suit' that any insured knew about or could have reasonably foreseen or discovered before the

---

[2]Although *Lee* identified two classes of cases subsequent to *Ruddock* which have allowed estoppel or waiver to bring coverage risks not covered by the policy terms or expressly excluded from the policy, 390 N.W.2d at 186, this case does not fall within either of these two classes. The exceptions identified in *Lee* are for cases where the insurer declined to defend its insured or where the inequity of forcing the insurer to pay on a risk for which it never collected premiums is outweighed by the inequity suffered by the insured because of the insurer's actions. *Id.*  *See also Smit v. State Farm Mut. Auto Ins. Co.*, 207 Mich. App. 674, 680-81, 525 N.W.2d 528 (1994).

'original inception date' of this coverage." Because there is no dispute that CHR could have reasonably foreseen the Mikkelsen and Gonzalez claims before the inception of Arch's coverage, they are excluded from coverage under the policy. The application of the waiver and estoppel doctrine under the circumstances of this case would result in broadening the coverage of a policy, such that it would cover a loss it never covered by its terms and create a liability contrary to the express provisions of the contract the parties did make. The waiver and estoppel doctrine is not available under these circumstances.

The Mikkelsen and Gonzalez claims were never within the contemplated coverage of the Arch policy. There is no authority to support CHR's contention that Arch had a burden to specifically exclude potential claims that it knew about when those claims were not initially covered under the policy.

In the alternative, CHR argues that the limitation on coverage did not apply because the written policy did not exist when coverage began, and the limitation on coverage language was not contained in the binder agreement. CHR contends that because the binder did not limit the scope of coverage to exclude "claims reasonably foreseen," once Arch issued the binder, it was obligated to provide insurance coverage to CHR for all claims, without regard to the limiting language. CHR reasons that this term either was not a part of the policy, or its absence in the binder rendered the policy so ambiguous that the Court would have to construe that ambiguity against the insurer and in favor of coverage for the Mikkelsen and Gonzalez claims.

13

Arch issued an insurance binder effective October 1, 2002. (Def. Ex. D). The binder was extended until Arch's written policy was issued on February 11, 2003. The binder provides that "[t]his insurance is subject to the terms and conditions of the policy(ies) the Company issues." (Pl. Ex. A, Apel Aff., Ex. 2).

"An insurance binder is a contract of temporary insurance to be effective insurance coverage until a formal policy is drafted and issued. It is not a complete contract in a sense, but is evidence of the existence of a contractual obligation to be expressed in complete written form at a later date." *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1278 (6th Cir. 1997) (quoting *State Auto. Mut. Ins. Co. v. Babcock*, 54 Mich. App. 194, 220 N.W.2d 717, 721 (1974)). "[T]he rights and liabilities of the parties pursuant to the insurance binder are determined by reference to the conditions of the policy expected to be issued." *Id.* (quoting *Blekkenk v. Allstate Ins. Co.*, 152 Mich. App. 65, 393 N.W.2d 883, 885 (1986)). "[A]ll ordinary provisions and exclusions of policies issued to cover similar risks will be read into the temporary binder, unless there was an express agreement at the time of the issuance of the binder which would make such provisions and exclusions inconsistent with the intent of the binder agreement." *Id.* (quoting *Harmon v. American Interinsurance Exch. Co.*, 39 Mich. App. 145, 197 N.W.2d 307, 309 (1972)

The absence of the limitation on coverage language in the binder does not preclude Arch from incorporating this language in the policy, nor does its absence render the coverage ambiguous. Arch was under no obligation to specifically exclude claims that were not within

14

the scope of coverage under the policy even if it was aware of those claims.  The Mikkelsen and Gonzalez claims did not have to be excluded by Arch because they were never within the scope of the policy.  Although Faiver states that "[h]ad CHR known that Arch did not intend to cover any claims that might result from the deaths of Mr. Mikkelsen or Mr. Gonzalez, CHR would not have purchased the policies from Arch," (Def. Ex. E, Faiver Aff. ¶ 11), this self-serving assertion is not sufficient to create an issue of fact as to the scope of coverage.

When Arch issued the binder it did not intend to issue a healthcare liability policy that provided coverage of a loss known by an insured prior to the inception of coverage.  Such coverage would not have been consistent with the policy language in the existing Arch policy forms.  (Stilwell Aff. ¶ 3).  Moreover, an exclusion of known risks is not an unusual provision in a healthcare policy.  A similar provision is found in the policy CHR had with Lexington.  Under the "Exclusions" heading the Lexington policy provides that it will not defend or pay claims for

> Any liability arising out of acts, errors or omissions of which an insured had knowledge prior to the inception date of the policy period, if, as of such date, an insured could reasonably foresee a claim might result.

Lexington Policy (Pl. Ex. O, CHR000087).  Lexington's umbrella policy does not broaden that coverage as it only insures when coverage is available in the underlying insurance.  (Lexington Policy, Pl. Ex. O, CHR000074).

Moreover, CHR does not dispute Arch's contention that Arch agreed to cover CHR according to the same terms contained in the Lexington policy. Faiver admits that CHR obtained a quote from Arch for insurance "similar" to the insurance it currently had from Lexington. (Faiver Aff. ¶ 5). According to Faiver, the Arch policies were purchased "for the express purpose of replacing the policies we had previously purchased from Lexington." *Id.* at ¶ 8. CHR does not assert that the Lexington policy would have covered known risks, nor does CHR assert that it could have obtained coverage from another insurer for these known risks for a comparable price.

Accordingly, the Court finds, as a matter of law, that the limitation on the scope of coverage was incorporated into the insurance binder. Thus, the policy, by its terms, did not cover potential claims known by CHR. The Court is also satisfied that there is no issue of fact that in October 2001, one year before the original inception date of the Arch policy, CHR knew that it could be the subject of a demand for damages or sued as a result of the deaths of Mr. Mikkelsen and Mr. Gonzalez. Accordingly, the Court finds, as a matter of law, that Arch has no duty to indemnify CHR for the Mikkelsen action or the Gonzalez incident.

## IV.

Having determined that Arch has no duty to indemnify CHR in connection with the deaths of Mikkelsen and Gonzalez, the Court also finds, as a matter of law, that Arch also has no duty to defend CHR in connection with claims arising out of either of those deaths.

"The duty to defend is related to the duty to indemnify in that it arises only with respect to insurance afforded by the policy. If the policy does not apply, there is no duty to defend." *American Bumper and Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450-51, 550 N.W.2d 475, 481 (1996) (citing *Protective Nat'l Ins. Co. v. City of Woodhaven*, 438 Mich. 154, 159, 476 N.W.2d 374 (1991). The duty to defend is broader than the duty to indemnify and applies "not only when the underlying claim is actually covered by the policy, but also when the underlying claim is 'arguably' covered by the policy." *Cincinnati Ins.*, 329 F.3d at 552 (quoting *Allstate Ins. Co. v. Freeman*, 443 N.W.2d at 737). Nevertheless, the duty to defend does not last forever. Once it is judicially determined that there is no indemnity coverage, the underlying claim is no longer "arguably" covered by the policy, and there is no longer any duty to defend. *American Bumper*, 452 Mich. at 455 ("insurers owe a duty to defend until the claims against the policyholder are confined to those theories outside the scope of coverage under the policy"). *See also Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 459 (6th Cir. 2003) (affirming district court's grant of summary judgment and declaration of no duty to indemnify or defend where claim asserted no theories of recovery that fell within the policy).

Accordingly, the Court enters summary judgment in favor of Arch on the duty to defend and will enter a declaration that Arch has no duty to defend CHR in the Mikkelsen action or in any claims arising out of the Gonzalez incident.

17

**V.**

Arch issued both a primary and an umbrella policy to CHR. CHR contends that even if it is not covered under the primary policy, it is still entitled to coverage under the umbrella policy.

Contrary to CHR's assertions, this language in the umbrella policy does not cover claims of which it knew or could have reasonably foreseen:

> Just as the underlying policy excludes known risks, so does the umbrella policy: But this coverage does not apply to any "claim" or "suit" that any insured knew about or could have reasonably foreseen or discovered before the original inception date" of this coverage.

(Arch Umbrella Policy, Coverage C, Pl. Ex. B).

Accordingly, the Court rejects CHR's contention that it is entitled to indemnification under the umbrella policy.

**VI.**

Finally, CHR contends that even if Arch had no coverage obligations with respect to CHR, it still owes coverage to the directors, officers and employees of CHR.

The Court declines to address this issue. Arch did not seek a declaration regarding its obligations to the directors, officers and employees of CHR in its complaint. This issue is accordingly not before this Court.

**VII.**

For all the reasons stated herein, the Court will grant Arch's motion for summary judgment and enter a declaration that Arch has no duty to defend or indemnify CHR in connection with claims arising out of the deaths of Mikkelsen or Gonzalez.

An order and judgment consistent with this opinion will be entered.


Date:     July 11, 2005                     /s/ Robert Holmes Bell
                                            ROBERT HOLMES BELL
                                            CHIEF UNITED STATES DISTRICT JUDGE